1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9             CENTRAL DISTRICT OF CALIFORNIA
10

11   RICHARD SCOTT BROOKS,          Case No.  2:18-CV-10506-JAK-KES
12          Petitioner
13      v.                          FINAL REPORT AND
                                    RECOMMENDATION OF U.S.
14   SCOTT FREUNHEIM,               MAGISTRATE JUDGE
15          Respondent
16
17

18       This Final Report and Recommendation ("R&R") is submitted to the

19   Honorable John A. Kronstadt, United States District Judge, pursuant to the

20   provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District

21   Court for the Central District of California.[1]

22       Richard Scott Brooks ("Petitioner") is a California state prisoner serving a

23   sentence of 61 years to life for multiple sex crimes, including sodomy and rape by

24   force or fear[2] of a minor and forcible human trafficking.  In November 2018, he

---

[1] Because this Final R&R is issued only to respond to Petitioner's objections
(Dkt. 45) to the initial R&R (Dkt. 44) and the recommendations remain unchanged,
a second objections period is not warranted.

[2] The Court occasionally uses the phrase "force or fear" herein as shorthand.

1

filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (Dkt. 1, "Petition.")[3]   For the reasons discussed below, the Petition should be denied.

# I.

## FACTUAL BACKGROUND

The underlying facts are taken from the unpublished California Court of Appeal decision on Petitioner's direct appeal.  (Lodged Document ["LD"] 6); People v. Brooks, No. B269650, 2017 WL 4111968, 2017 U.S. Dist. LEXIS (Cal. Ct. App. Sept. 18, 2017).  Unless rebutted by clear and convincing evidence, these facts may be presumed correct.[4]  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir.

---

The phrase is intended to refer to the relevant element of the respective crimes involving, for example, force or fear.  See Cal. Pen. Code §§ 261(a)(2) (rape includes sexual intercourse where "it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another"), 286(c)(2)(C) (sodomy includes sexual conduct of contact between penis and anus with "another person who is a minor 14 years of age or older when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim"), 236.1(c)(2) (enhanced punishment for trafficking of a minor that "involves force, fear, fraud, deceit, coercion, violence, duress, menace or threat of unlawful injury to the victim or to another person").

[3] Except for the Clerk's Transcript ("CT") and the Reporter's Transcript ("RT"), most page citations are to the Court's electronic filing system (CM/ECF). Given the piecemeal filing with the Court of various sealed and other documents, the Court occasionally references portions of the CT and RT by CM/ECF docket number and page.

[4] The Answer's "Statement of Facts" was based on this summary of the evidence from the California Court of Appeal's opinion.  (Dkt. 21 at 13.)  Petitioner argues that it is "unlawful and un-American" to rely on the Court of Appeal's summary, because the evidence presented at trial did not reflect the "true nature of events."  (Dkt. 25 at 3.)  The Court understands this as an argument that (1) Doe testified falsely and (2) Petitioner should have been permitted to introduce additional evidence.  Regarding the first argument, the Court of Appeal accurately summarized both Doe's and Petitioner's conflicting testimony.  The second

2008); 28 U.S.C. § 2254(e)(1).

*Jane Doe, who was born in June 1997, lived with her mother and little sister in Los Osos. From the time she was three or four years old until she was nine, Doe was molested by her grandfather. The grandfather threatened to shoot Doe if she disclosed the abuse. When she finally disclosed the abuse, Doe's grandfather committed suicide.*

*On July 19, 2014, about three weeks after her 17th birthday, Jane Doe's mother and sister left town on a 10-day vacation. Jane Doe had the house to herself. She responded to a Craigslist posting entitled, "Only serious unfaithful sluts apply," created by [Petitioner], a 38-year old San Francisco man. The posting stated that [Petitioner] was "looking for: a serious, young, careless, unfaithful, caring slut for a girlfriend."[5] In her response, Doe described herself as "an 18-year-old horny slut" who was looking for "a sexual, dirty relationship" in which she would be controlled.*

*During the next week, [Petitioner] and Doe exchanged numerous text messages, emails, sexually explicit photographs and telephone calls. On several occasions, [Petitioner] directed Doe to send him pictures of specific body parts, to pose in specific positions, or to photograph herself with a dated post-it note bearing specific words. Doe referred to [Petitioner] as "Daddy" and "master" in some of these communications. She also volunteered information about specific sexual acts she was willing to participate in. Doe recognized that her communications with [Petitioner] indicated she was willing to be submissive to him and to engage in a submissive-dominant sexual relationship with him.*

---

argument is Petitioner's due process claim, discussed as Ground Two below.

[5] *The post went on to explain that [Petitioner] wanted a "sweet and nurturing" girl who would also be "completely unfaithful" with multiple partners engaging in specified sex acts, while he took pictures and video of those acts.*

3

*[Petitioner] and Doe made plans to meet in person on July 25.  Doe drove over 200 miles to meet [Petitioner] at the Fremont BART station.  As soon as she saw [Petitioner], Doe began to regret her decision.  [Petitioner] arrived wearing all black and Doe found his appearance scary.  Doe didn't want to follow through on their arrangement, but felt like she couldn't leave because [Petitioner] "was very demanding in what he wanted."*

*Despite her misgivings, Doe let [Petitioner] get into her car.  While they were still at the Fremont station, [Petitioner] took Doe's identification out of her wallet and commented on the fact that she was 17 years old.*

*Doe and [Petitioner] drove away from the station.  Within a few minutes, [Petitioner] instructed Doe to pull over into a gas station parking lot.  There, he "grab[bed] the back of [Doe's] head and shove[d] it onto his genitalia."  Doe hesitated.  [Petitioner] told her that she "had to do what he wanted and that he – it was too late for me to change my mind because he was already there."  After about five minutes, [Petitioner] let go of Doe's head, allowing her to stop and take her mouth off of his penis.*

*Doe drove [Petitioner] back to her house in Los Osos.  He stayed there, with her, until July 28.  When they arrived, [Petitioner] gave Doe alcohol and showed her videos depicting both child pornography and "very rough" adult pornography.  Doe told [Petitioner] she did not want to look at child pornography because she had been molested by grandfather when she was a child.  [Petitioner] yelled at Doe that she did not have a choice; he told Doe she needed to listen to him and like what he told her to like.  Later, [Petitioner] asked Doe a lot of questions about being molested.  Shortly after this conversation, [Petitioner] had very forceful sexual intercourse with Doe on the couch in the living room.  [Petitioner] had intercourse with Doe again that night.*

*[Petitioner] stayed at Doe's house for four days.  During that time, Doe estimated there were more than five instances of oral copulation and more than 10*

4

*instances of sexual intercourse.  Doe testified that, on several occasions, sexual activity occurred while she was unconscious from too much alcohol.  In one instance, Doe woke up to find [Petitioner] having intercourse with her.  In another instance, she woke up to find his mouth on her vagina.*

*[Petitioner] took photographs and videos of Doe posing in sexually suggestive ways and engaging in sexual activity with him.  In some of the videos, Doe made statements and behaved in a way that suggested she was enjoying herself.  In another video, Doe appeared to be unconscious while [Petitioner] sodomized her.*

*Doe testified that [Petitioner] never directly threatened her with physical injury.  [Petitioner] told Doe that she was not allowed to object to or protest his advances.  He also told Doe, "if [she] wasn't going to go along with what he wanted, that [Doe] wasn't going to be very happy with the end result."  Doe thought [Petitioner] looked "scary" and "kind of angry."  [Petitioner] said he had gone to jail before and knew how to take care of himself.  He wasn't worried about anything because he could get away with whatever he wanted.  Later on, [Petitioner] told Doe, "law enforcement better not get involved because, um, he wouldn't be very happy about that and I wouldn't be happy with him being upset."  He warned Doe that she shouldn't try to "fuck up" his life, because he could "sure as hell" ruin hers.  Doe did not believe that she could challenge [Petitioner] or get away from him.*

*On July 27, [Petitioner] placed four advertisements on Craigslist, offering to "share" a "barely legal sex slave" for money.  The price was $200 per hour and the advertisements specified that [Petitioner] would be present to protect the girl and to "make sure she doesn't say no."  [Petitioner] posted two more advertisements the next day, July 28.  One man who responded to the ad declined to meet Doe after seeing her picture because he concluded she was underage.*

*Another man, Oscar Higueros, exchanged messages with [Petitioner] and*

5

*then came to Doe's house.  When Higueros arrived at the house, he spoke with*
*[Petitioner] about the rules and the amount of money he would pay to have sex with*
*Doe.  After that, Higueros and Doe went into a bedroom together.  Higueros had*
*vaginal sex with Doe and placed his penis inside her mouth.  When he was leaving*
*Doe's house, [Petitioner] was angry with him because he stayed longer than 30*
*minutes and did not want to pay more money.  [Petitioner] refused to give any of*
*the money to Doe, saying he needed it to get back to San Francisco.  Doe took*
*[Petitioner] to a motel because her boyfriend was coming to the house later that*
*day and because her mother was expected home the following day.*

*The next day, July 29, Doe ended her relationship with her boyfriend and*
*began a relationship with Higueros.  At Higueros' request, Doe sent several text*
*messages to [Petitioner].  She called [Petitioner] the "best daddy ever" and told*
*him that she loved him.  Doe also asked [Petitioner] to send her the photographs*
*and videos he had taken of her and their sexual activity together.  [Petitioner] did*
*not comply.  Doe showed up at [Petitioner's] motel later that day, because he told*
*her that he had some money for her.  When she arrived, [Petitioner] did not give*
*Doe any money.  She left the motel, feeling like she had been "played."*

*[Petitioner] returned to San Francisco, where he continued to post on*
*Craigslist, "looking for a very, very dirty little girl," who wanted a "serious daddy*
*master."  In another posting, [Petitioner] claimed to have a 23-year-old "little*
*cumslut" who wanted to be shared with men and girls.  A third advertisement,*
*posted on August 14, sought a "Personal on-call or live-in sex slave/cumslut," who*
*would not be allowed to say "no."  About two weeks later, [Petitioner] exchanged*
*emails with someone who claimed to be a girl under the age of 18.  [Petitioner]*
*wrote that he had had sex with underage girls before.*

*In early September, Doe contacted law enforcement about [Petitioner].*[6]

---

[6] In fact, a third party mandated reporter had reported the incident, and law
enforcement contacted Doe.  (See Dkt. 42-1 [Defendant's pre-trial motion to set

*Working with a detective from the Sheriff's Department, Doe made a recorded pretext call to [Petitioner].  After the phone call, [Petitioner] used Craigslist to solicit men to have sex with Doe for money.  He made a reservation at a San Francisco hotel, where he planned to "host" a "party" during which the men who responded to the ad would have sex with Doe.  [Petitioner] arranged to meet Doe at a train station.  He was arrested when he arrived.  At the time of his arrest, [Petitioner] was carrying an external hard drive and two cell phones.  Each of these devices held photographs and video of depicting sexual activity between [Petitioner] and Doe, and other pornographic images of children.  In addition, both the external hard drive and one of the phones held photographs of Doe's driver's license, high school identification card and county health medical card.*

*[Petitioner's] defense at trial was that he reasonably believed Doe was at least 18 years old, she consented to all of their sexual activity and he never used force or fear with her.  He testified that he believed Doe when she told him she lost her driver's license.  He did not discover her actual age until July 28.[7] [Petitioner] further testified that Doe initiated most their sexual activity.  She also asked him to post the Craigslist advertisement that brought Higueros to the house. Higueros did not give [Petitioner] any money.  Instead, [Petitioner] made $150 from another person, who hired [Petitioner] to do some web design work. [Petitioner] also denied knowingly possessing child pornography images on his cell phone.  He speculated the images might have been "imbedded" or hidden in adult pornographic images he had downloaded from a commercial site.[8]  Finally,*

_____

aside certain counts].)

[7] Petitioner in fact testified that he learned her age on the night of July 27. (See 17 RT 4863-64; 19 RT 5435, 5496; 15 RT 4267-4268.)

[8] The jury heard evidence that Petitioner had been convicted in 2010 of possession of child pornography.  (See 11 RT 3037.)  He testified that he was "gestapo'd" into a plea bargain after his thumbprint was found on printouts of child

1   *[Petitioner] denied that Doe was the girl he advertised for "sharing" on Craigslist*
2   *[in September].  That ad referred to another girl and the request for money was to*
3   *get help paying for the room.*  (LD 6 at 3-8.)

4                                              **II.**

5                              **PROCEDURAL HISTORY**

6   **A.     Verdict and Sentence.**

7              The jury convicted Petitioner of 18 total counts, as follows: oral copulation

8   with a person under the age of 18 (Counts 1 through 4); oral copulation of a person

9   who was prevented from resisting by an intoxicating or anesthetic substance (Count

10  5); oral copulation of an unconscious person (Count 6); rape by force or fear of a

11  minor who was at least 14 years old (Count 7); sodomy by force or fear of a minor

12  who was at least 14 years old (Count 11); sodomy of a person under the age of 18

13  (Counts 12 and 13); sodomy of an unconscious person (Count 14); human

14  trafficking by causing, inducing, or persuading a minor to engage in a commercial

15  sex act by means of force, fear, fraud, deceit, coercion, duress, or menace (Count

16  16); pimping a minor over the age of 16 (Count 17); pandering by encouraging a

17  minor over the age of 16 to engage in an act of prostitution (Count 18); using a

18  minor to engage in sexual posing or modeling for commercial purposes (Count 19);

19  possession of matter depicting a minor engaging in or simulating sexual conduct

20  (Count 20); distribution of matter that shows a minor engaging in sexual conduct

21  (Count 21); contacting a minor with the intent to commit a specified sexual offense

22  (Count 22); and human trafficking by causing, inducing, or persuading a minor to

23  engage in a commercial sex act (Count 23). (2 CT 339-41 [information]; 1 CT 234-

24  262 [verdict].)

25             The trial court sentenced Petitioner to an indeterminate term of 15 years to

26  _____

27  pornography; he claimed that he had loaded the printer but someone else had
    printed out the child pornography.  (See 18 RT 5215-16.)

28

                                              8

1    life on Count 16 (forcible human trafficking) and an aggregate term of 46 years and

2    8 months for the remaining counts, for a total term of 61 years 8 months to life.  (24

3    RT 6921; 2 CT 3161-65.)

4    **B.**    **<u>Direct Appeal.</u>**

5         Petitioner appealed his judgment and sentence to the California Court of

6    Appeal.  (LD 3.)  The California Court of Appeal affirmed the judgment.  (LD 6.)

7    Petitioner filed a petition for review in the California Supreme Court, which was

8    summarily denied.  (LD 7, 8.)

9    **C. <u>Federal Habeas Proceedings.</u>**

10         In November 2018, Petitioner filed the Petition.  Respondent filed an answer

11    to the Petition in June 2019.  (Dkt. 21.)  Petitioner filed a reply.[9]  (Dkt. 25.)  At the

12    Court's request, Respondent lodged supplemental documents in December 2019.

13    (Dkt. 34.)  In March 2020, the Court asked Petitioner to clarify his second ground,

14    which he did.  (Dkt. 36, 37.)  The Court then asked Respondent to locate certain

15    documents in the record and also clarify the scope of its procedural default

16    argument, which it did.  (Dkt. 38, 41.)

17         In January 2021, the Court issued its initial Report and Recommendation,

18    recommending that the Petition be dismissed.  (Dkt. 44.)  Petitioner filed

19    objections.  (Dkt. 45.)

20

21

22

---

23        [9] In his reply, Petitioner asserts that the judge who sentenced him was "one

24    of 3 judges that denied my appeal and review.  I'm fairly certain that is not legal as it is a conflict of interest."  (Dkt. 25 at 4.)  The judge who sentenced Petitioner was

25    the Honorable Rita Federman.  (24 RT 6301.)  The three-judge panel of the California Court of Appeal, Second District, Division 6, that decided Petitioner's

26    direct appeal was comprised of Justices Kenneth Yegan, Arthur Gilbert, and Steven

27    Perren.  (LD 6 at 23.)  Judge Federman's name appears at the bottom of the appellate decision.  (<u>Id.</u> at 24.)  This may be the source of Petitioner's confusion.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### ARGUMENTS

The Petition asserts the following grounds for relief[10]:

Ground 1: The trial court violated Petitioner's Sixth Amendment right to a fair trial when it failed to investigate adequately an allegation that one of the jurors was under the influence alcohol during the trial.  (Petition at 6.)

Ground 2A: There was constitutionally insufficient evidence to convict Petitioner of the counts involving force or fear.  (Id.; see also Dkt. 25 at 6-7; Dkt. 37 at 2.)

Ground 2B: The trial court violated Petitioner's rights to confront witnesses and present evidence in his defense by improperly excluding evidence that Petitioner did not use force or fear.  (Petition at 7.)

Ground 3: Petitioner's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.  (Petition at 8.)

Respondent argues that Grounds 1, part of Ground 2B (i.e., exclusion of evidence regarding Doe's sexual conduct with other men), and Ground 3 are procedurally defaulted.  (Dkt. 21 at 19-23; Dkt. 41 at 10-13.)  Alternatively, Respondent argues that all claims fail on the merits.  (Dkt. 21 at 24-34; Dkt. 41 at 13-24.)

### IV.

### LAW GOVERNING STANDARD OF REVIEW

Federal habeas relief is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  AEDPA provides that, where a claim was "adjudicated on the merits in State court proceedings," federal habeas relief is not appropriate

---

[10] The Petition originally raised an ineffective assistance of trial counsel claim.  After Respondent moved to dismiss it as unexhausted, Petitioner voluntarily dismissed this ground.  (See Dkt. 11, 14-16.)

1   unless that adjudication:

2       (1) resulted in a decision that was contrary to, or involved an

3       unreasonable application of, clearly established Federal law, as

4       determined by the Supreme Court of the United States; or

5       (2) resulted in a decision that was based on an unreasonable

6       determination of the facts in light of the evidence presented in the

7       State court proceeding.

8   28 U.S.C. § 2254(d).

9       The relevant "clearly established Federal law" under § 2254(d)(1) consists of

10  only Supreme Court holdings (not dicta), applied in the same context that petitioner

11  seeks to apply it to, existing at the time of the relevant state court decision.  Premo

12  v. Moore, 562 U.S. 115, 127 (2011).  A state court acts "contrary to" clearly

13  established Federal law if it applies a rule contradicting the relevant holdings or

14  reaches a different conclusion on materially indistinguishable facts.  Price v.

15  Vincent, 538 U.S. 634, 640 (2003).  A state court "unreasonably appli[es]" clearly

16  established federal law if it engages in an "objectively unreasonable" application to

17  the facts of the correct governing legal rule.  White v. Woodall, 572 U.S. 415, 419

18  (2014).  The same standard of objective unreasonableness applies where the

19  petitioner is challenging the state court's factual findings under 28 U.S.C.

20  § 2254(d)(2).  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

21      Habeas relief may not issue unless "there is no possibility fairminded jurists

22  could disagree that the state court's decision conflicts with [the United States

23  Supreme Court's] precedents."  Harrington v. Richter, 562 U.S. 86, 103 (2011).

24  "[T]his standard is 'difficult to meet,'" Metrish v. Lancaster, 569 U.S. 351, 358

25  (2013), as even a "strong case for relief does not mean the state court's contrary

26  conclusion was unreasonable," Richter, 562 U.S. at 102.

27      The relevant state court decision for AEDPA review is the last reasoned

28  decision.  Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991).  The federal court "looks

through" subsequent unexplained decisions, presuming that those decisions denied relief on the same grounds as the last reasoned decision.  Id. at 804.  In the present case, the relevant state court decision is the opinion issued by the California Court of Appeal on direct appeal.  (LD 6.)

**V.**

**DOCTRINE OF PROCEDURAL BAR**

On habeas review, federal courts will not review a claim on its merits if it is procedurally defaulted, that is, where a state court denied relief on an "adequate and independent" state law ground.  Coleman v. Thompson, 501 U.S. 722, 729 (1991); see also Walker v. Martin, 562 U.S. 307, 315-16 (2011).  For a claim to be procedurally defaulted for federal habeas corpus purposes, the opinion of the last state court rendering a judgment in the case "must clearly and expressly" state that its judgment rests on a state procedural bar.  Harris v. Reed, 489 U.S. 225, 263 (1989).  "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"  Martin, 562 U.S. at 316 (quoting Beard v. Kindler, 558 U.S. 53, 617 (2009)).  "[A] discretionary state procedural rule can serve as an adequate ground to bar federal habeas review[,] … even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  Kindler, 558 U.S. at 618.

When the respondent shows that a claim is procedurally barred, the burden of proof shifts to the petitioner to show "cause" for the default and actual "prejudice" resulting from the alleged constitutional violation.  Carter v. Giubino, 385 F.3d 1194, 1198 (9th Cir. 2004). Cause for a procedural default exists where "something external to the petitioner, something that cannot fairly be attributed to him impeded his efforts to comply with the State's procedural rule."  Maples v. Thomas, 565 U.S. 266, 280 (2012); Blake v. Baker, 745 F.3d 977, 982, 984 (9th Cir. 2014) (holding "good cause" to obtain a stay turns on whether the petitioner can set forth a reasonable excuse, supported by sufficient evidence, to justify failure to exhaust;

12

obtaining a stay does not require "any stronger showing of cause" than that sufficient to excuse a procedural default).

In extraordinary cases, a federal habeas court may grant a writ even in the absence of cause if the defendant was a "victim of a fundamental miscarriage of justice." Murray v. Carrier, 477 U.S. 478, 495-96 (1986).  An extraordinary case is one in which a constitutional violation probably has resulted in the conviction of one who is actually innocent. Id. at 496.

To show prejudice sufficient to excuse a procedural default, the petitioner "must establish not merely that the alleged error created a possibility of prejudice, but that it worked to his actual and substantial disadvantage, infecting the entire proceeding with constitutional error." Stokley v. Ryan, 705 F.3d 401, 403 (9th Cir. 2012) (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (prejudice requires a showing that the error has a "substantial and injurious effect" on the verdict)). Stated differently, the petitioner must show there is "a reasonable probability" that the jury would have reached a different result but for the error.  Clark v. Brown, 450 F.3d 898, 916 (9th Cir. 2006) (interpreting Brecht).

The Ninth Circuit has noted, "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002); see also Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.  Judicial economy might counsel giving the Teague question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Thus, where a claim is "clearly not meritorious" on de novo

review, courts may deny it on the merits notwithstanding the possible procedural bar.  Ayala v. Chappell, 829 F.3d 1081, 1096 (9th Cir. 2016).

# VI.

# DISCUSSION

**A.**   **Ground 1: Whether the Trial Court Violated Petitioner's Sixth Amendment Right to a Fair Trial by Failing to Conduct an Adequate Inquiry into Whether a Juror was Intoxicated.**

   **1.  Trial Court Proceedings.**

   The trial court conducted jury selection over several days.  On October 27, 2015, the court questioned prospective juror no. 1621815, a man eventually seated as Juror No. 9. (Dkt. 34-8 at 148, 183.)  The man explained that he was a recently retired sociology professor who had served as a juror on four prior trials; he could recall the subject matter of all.  (Id.)  He had studied poverty in third-world countries, including human trafficking, resulting in three books on southeast Asia. (Id. at 150, 161-64.)  He answered voir dire questions clearly and thoroughly.  (Id.)

   On November 18, 2015, during a recess between closing arguments, a juror handed the bailiff a note that said, "Some jurors have concern that Juror No. 9 is under the influence of alcohol more than once during the trial.  Today is an example." (22 RT 6359; Dkt. 33-11 at 3 [note].)  After receiving the note, the trial court alerted both attorneys to discuss the matter.  (Id.)

   The trial court told counsel that it was "very surprised" by the note, because it had watched the jury and seen that Juror No. 9 looked engaged and took notes during the closing arguments.  (22 RT 6360.)  The trial court concluded that it "had not seen anything that would indicate … he is impaired" but asked the attorneys and bailiff for their observations.  (Id.)

   The prosecutor noted that Juror No.9 was a retired professor who moved slowly and had a flushed complexion.  (Id.)  Defense counsel agreed that he had not seen "anything that suggested to me that he was impaired." (22 RT 6361.)  The

bailiff reported that he had made small talk with Juror No. 9 several times and never noticed a smell, slurred speech, red eyes, or anything else indicating that Juror No. 9 was under the influence of alcohol.  (Id.)  The bailiff did observe that Juror No. 9 had a flushed face but saw "nothing other than that… that would make [him] suspicious."  (Id.)  The bailiff promised to monitor the situation and bring anything he noticed to the trial court's attention.  (Id.)

The court announced a tentative plan to question the juror who had passed the note to the bailiff.  (22 RT 6362.)  Neither attorney objected or suggested a different course.  (Id.)

After a recess, the trial court questioned the juror who had passed the note with counsel and Petitioner present.  (22 RT 6362-63.)  The juror told the court that she had been talking with Juror No. 1 that morning when she asked Juror No. 9 a friendly question.  She observed that he smelled "like alcohol and was all shaky;" his walk was "unusual."  (22 RT 6363.)  The juror reported that she had talked to Juror No. 9 three different times when she noticed a "strong alcohol" smell, especially in the morning.  (22 RT 6363-64.)  She also said that she discussed this with Juror No. 1.  Juror No. 1 asked her, "Did you smell?" and she replied, "Yes I did, this morning."  (Id.)

The trial court again expressed his surprise because it "had not been able to observe any signs that [Juror No. 9] would have been under the influence."  (22 RT 6364.)  The juror suggested that Juror No. 9 might have seemed slow in his conversations with her because he had difficulty understanding her accent, but she affirmed that "he smelled and he act[ed] like somebody under the influence this morning."  (22 RT 6365.)

The trial court announced that since no court personnel had observed any signs of impairment, the court did not "have enough information to do anything further at this point."  (Id.)  The court assured the juror that this was a serious matter, instructed her to raise the issue again if it caused problems during

deliberations, and informed her that the bailiff would be monitoring Juror No. 9's condition.  (Id.)

Next, the trial court brought in Juror No.1 for questioning.  (22 RT 6366.) Juror No. 1 reported that he had "not interacted" with Juror No. 9, but that he had smelled alcohol "one time a few days ago."  (22 RT 6366-67.)  He denied smelling alcohol that morning, thereby contradicting the other juror's account.  (Id.)  The trial court explained to Juror No. 1 that since no court personnel had observed evidence of impairment, the trial would proceed; however, the court instructed Juror No. 1 to raise the issue again if Juror No. 9's condition "impaired the ability of the jurors to deliberate."  (22 RT 6367.)

The court concluded the matter by instructing the bailiff to bring any relevant observations to the court's attention and announcing that it was ready to bring the jury back into the courtroom to complete closing arguments.  Again, neither counsel objected to the court's handling of the situation.  (22 RT 6368.)

The trial continued, and no one subsequently raised any issue concerning Juror No. 9's ability to deliberate.  The jury reached verdicts on all counts two days later.  (23 RT 6602-03.)  The jurors affirmed as a group that the court clerk accurately read their verdicts.  (23 RT 6618.)  Defense counsel waived polling of the individual jurors.  (23 RT 6619.)

## 2.  The California Court of Appeal's Decision.

Petitioner argued that the trial court erred because it did not conduct a sufficient investigation into the accusation that Juror No. 9 was under the influence of alcohol.  (LD 3 at 102.)  The State argued that Petitioner had forfeited this claim "because he failed to ask the trial court to conduct any additional inquiry or to excuse Juror 9."  (LD 4 at 54.)  In reply, Petitioner argued that the issue was not forfeited, because the trial court had a duty to inquire regardless of what defense counsel requested or failed to request.  (LD 5 at 8, 11.)  Petitioner did not, however, factually dispute that he and his lawyer failed to object to the trial court's proposed

16

1    course.

2           The Court of Appeal denied relief, reasoning as follows:

3           *[Petitioner] contends the trial court erred because it did not conduct a*

4    *sufficient investigation into an allegation that one of the jurors was under the*

5    *influence of alcohol during the trial.  Specifically, [Petitioner] contends the trial*

6    *court should have interviewed all of the jurors, including the juror at issue.  We*

7    *conclude [Petitioner] has forfeited the claim because he did not ask the trial court*

8    *to conduct a more extensive investigation or to excuse the juror.  There was no*

9    *error.*

10                                          *...*

11          *A claim of juror misconduct is forfeited unless the defense requests that the*

12   *juror be excused or otherwise objects to the trial court's course of action.  (People*

13   *v. Holloway (2004) 33 Cal.4th 96, 124.)  [Petitioner's] trial counsel did not request*

14   *that Juror 9 be excused or object when the trial court resumed the trial without*

15   *conducting additional juror interviews.  His claim of error has been forfeited.*

16          *Had the claim not been forfeited, we would reject it because the trial court*

17   *did not abuse its discretion when it declined to excuse Juror No. 9.  (People v.*

18   *Bonilla (2007) 41 Cal.4th 313, 350- 353.)  The trial court spoke to both jurors who*

19   *expressed concern about Juror No. 9.  It also questioned defense counsel, the*

20   *prosecutor and the bailiff about their observations of the juror.  The bailiff*

21   *explained he made small talk with Juror No. 9 on several occasions and had never*

22   *smelled alcohol on his breath or observed other signs of intoxication.  Similarly,*

23   *the trial court noted it had personally observed Juror No. 9 and had concluded he*

24   *was not intoxicated or impaired.  In the absence of any other evidence that Juror*

25   *No. 9 could not perform his duties, or a request for additional action by the*

26   *defense, the trial court acted within the bounds of reason when it concluded the*

27   *inquiry and resumed trial.  (People v. Manibusan (2013) 58 Cal.4th 40, 53; People*

28   *v. Allen (1986) 42 Cal.3d 1222, 1266.)*

17

1   (LD 6 at 19-21.)

2   ### 3.  Ground 1 is Procedurally Defaulted, and Petitioner Has Not

3   ### Shown Cause and Prejudice to Excuse the Default.

4   Respondent argues that Ground One is procedurally defaulted because it was

5   denied on an independent and adequate state law ground: California's

6   contemporaneous objection rule.  (Dkt. 21 at 21-22.)  The Ninth Circuit has

7   recognized that California's contemporaneous objection rule is an adequate and

8   independent state procedural rule.  <u>Zapien v. Davis</u>, 849 F.3d 787, 793 n.2 (9th Cir.

9   2015); <u>Fairbank v. Ayers</u>, 650 F.3d 1243, 1256 (9th Cir. 2011).  Thus, Ground One

10  is procedurally defaulted.

11  Where the respondent shows that a claim is procedurally defaulted, the

12  burden of proof shifts to the petitioner to show "cause" for the default and actual

13  "prejudice" resulting from the alleged constitutional violation.  <u>Carter v. Giubino</u>,

14  385 F.3d 1194, 1198 (9th Cir. 2004).  Here, rather than arguing that "cause" exists

15  for failing to object, Petitioner disputes that he failed to object, as follows:

16  In Ground One of the habeas corpus, I expressed that Juror No. 9 was

17  intoxicated during trial.  ***I did absolutely object*** to the continuing of

18  the trial.  However, the judge had a sidebar with the D.A. and defense

19  counsel and decided to ignore my objection.  I was then threatened

20  that if I said anything else on the matter, I would be removed from the

21  courtroom and I'd be watching my trial from a monitor.  This threat

22  happened twice.

23  (Dkt. 25 at 8 (emphasis added).)

24  Nothing in the record memorializes any objection that Petitioner or his

25  lawyer made after the judge informed the parties about the note suggesting Juror

26  No. 9 was under the influence of alcohol.  The only statement by Petitioner after the

27  judge told the parties about the note and before the jury announced its verdict was

28  Petitioner thanking the judge for doing "a good job as far as everything is

concerned." (22 RT 6388.)

At the beginning of trial, the judge admonished Petitioner twice for inappropriate behavior. (3 RT 640; 6 RT 1528.) The trial judge, however, declined to rule that Petitioner should be restrained. (6 RT 1527.) If this is what Petitioner recalls, then it was not an objection to how the judge investigated concerns about Juror. No. 9.

Having failed to show that he objected or cause for failing to object with resulting prejudice, Petitioner is not excused from the procedural default of Ground One. This Court, therefore, is barred from considering Ground One. See Martinez-Villareal v. Lewis, 80 F.3d 1301, 1305 (9th Cir. 1996) ("Because Martinez-Villareal either has not contested or has failed to show cause for lifting the procedural bar, we cannot reach the merits of other procedurally defaulted claims.").

**B.   Ground 2A: Insufficient Evidence for Counts 7, 11, and 16**

Petitioner argues that there was insufficient evidence supporting Counts 7, 11, and 16. (Petition at 7; Dkt. 25 at 6-7; Dkt. 37 at 2.) On appeal and in his federal petition, Petitioner focuses on the "issue of force." (See Petition at 7.)

The relevant convictions are for Counts 7 (rape of a minor by force or fear), 11 (sodomy of a minor by force or fear), and 16 (human trafficking by means of force, fear, fraud, deceit, coercion, duress, or menace). The incident charged in Count 7 was the sex that occurred on July 25, 2014. (See Dkt. 42-1 at 15 [information giving range between July 25 and July 29, 2014]; Dkt. 22-22 at 56 [prosecutor stating in closing argument that Count 7 was the rape that occurred on the first day].)[11] The jury found Petitioner not guilty of forced rape charges for the

---

[11] Specifically, the prosecutor said, "The forced [rapes] . . . which are counts 7, 8, 9, and 10. Four days, four rapes. She said there was about ten times where he put his penis into her vagina. Four is plenty. One a day." (Dkt. 22-2 at 56.)

subsequent three days, i.e., Counts 8, 9, and 10.  (See Dkt. 42-1 at 261-63.)

The incident charged in Count 11 was the first of several sodomy incidents between July 25 and July 28.  It is unclear on what day this first incident occurred[12]: Doe testified that she could not remember the day that Petitioner first put his penis in her anus.  (See Dkt. 22-12 at 78.)  She also confirmed when shown a video of Petitioner sodomizing her that she was unconscious and unaware of Petitioner's actions on that occasion.  (See id. at 117-18.)  She was shown a second video showing Petitioner sodomizing her, and although the video shows her getting up, she had no memory of the incident.  (See id. at 124.)  She could recall two separate acts of sodomy by Petitioner; she had not verbally protested, but before the acts of sodomy, Petitioner had told her that she did not "have a say" and she felt like she could not say "no" to the sodomies.  (Dkt. 22-13 at 42-43.)  The information charged Petitioner with three counts of sodomy by force or fear between July 25 and July 29: Counts 11, 12, and 13.  (See Dkt. 42-1 at 17; see also Dkt. 22-22 at 56 [prosecutor at closing argument stating that he charged three sodomies for the "two or three" forced incidents Doe had described].)  The jury found Petitioner not guilty of sodomy by force or fear in Counts 12 and 13 and instead found him guilty of the lesser included offense of sodomy with a person under 18.  (Dkt. 42-1 at 265-68.)

### 1.  California Court of Appeal's Opinion.

The California Court of Appeal held as follows:

*[Petitioner] contends the evidence is insufficient to establish that he committed the offenses by means of force, fear or duress because Doe never*

---

[12] Respondent argues that Count 11 was the incident where Petitioner sodomized Doe while she was unconscious.  (See Dkt. 41 at 13.)  It does not appear that this is the case.  In the prosecutor's closing argument, he treated Count 11 as separate from the count for sodomy while Doe was unconscious.  (See 21 RT 6056 ["So, the nonforced are the intoxicated . . . unconscious.  The sodomy, unconscious; there are two of those."].)

1   *effectively communicated to him that she had withdrawn her consent to have sex*

2   *with him.  Before they met, Doe sent [Petitioner] numerous emails and text*

3   *messages stating her consent.  After they met, according to [Petitioner], Doe did*

4   *not tell him that she no longer consented.  Thereafter, she had sex with [Petitioner]*

5   *without objection.  She also behaved in a way that was consistent with consent, and*

6   *inconsistent with the use of force or duress by [Petitioner].  Doe took time off work*

7   *to spend time with [Petitioner].  She told him that she did not like kissing or*

8   *watching his child pornography.  She also complained about not making money*

9   *during their time together.  When Doe told [Petitioner] to leave, he did.*

10   *The prosecution's theory was that Doe submitted to [Petitioner]'s sexual*

11   *demands as a result of duress or fear.  As a young child, she had been repeatedly*

12   *molested by her grandfather.  Once Doe saw [Petitioner], she decided she did not*

13   *want to go through with their arrangement.  She found him "scary" and*

14   *intimidating, but she believed it was too late for her to tell him no.  [Petitioner]*

15   *also made comments to Doe that she found intimidating: he told her that she was*

16   *not allowed to say "no" to him and that, if she failed to do what he wanted, things*

17   *would not end well for her.  [Petitioner] told Doe he had been to prison and knew*

18   *how to take care of himself.  He also said that he would ruin her life if she messed*

19   *with his.  The prosecution argued these statements amounted to duress or fear*

20   *within the meaning of the three statutes at issue.*

21   *To prove that [Petitioner] committed the offenses by force, "the prosecutor*

22   *was merely required to prove that the act of [human trafficking, rape or] sodomy*

23   *was accomplished by enough physical force to overcome the victim's will.*

24   *[Citation.]" (People v. Hale (2012) 204 Cal.App.4th 961, 978–979 (Hale).)  These*

25   *offenses are committed by duress where the perpetrator uses "'"'a direct or*

26   *implied threat of ... hardship or retribution sufficient to coerce a reasonable person*

27   *of ordinary sensibilities to ... perform an act which otherwise would not have been*

28   *performed ....'" [Citation.]' [Citations.] 'Duress can arise from various*

*circumstances, including the relationship between the defendant and the victim and their relative ages and sizes.... [Citation.]' [Citation.]" (Hale, supra, at p. 979.)*

*A reasonable trier of fact could find that [Petitioner] used duress or menace to commit the offenses at issue.  Within minutes of meeting Doe, [Petitioner] was instructing her to perform oral sex and warning her that, if she did not obey, he would not be happy and things would not end well for her.  [Petitioner] made similarly intimidating statements to Doe throughout their time together.  He bragged about having been in jail and said he could take care of himself. [Petitioner] told Doe he could get away with anything and that he would ruin her life if she messed with his.  He also warned Doe that he would be unhappy if law enforcement got involved, and Doe would not be happy if he wasn't happy.  Doe was 21 years younger than [Petitioner].  She described herself as a submissive person and a survivor of childhood sexual abuse.  The jury could reasonably rely on this evidence to conclude that [Petitioner]'s menacing, intimidating remarks and demeanor were sufficient to overcome Doe's will and to coerce her into performing acts she would not otherwise have performed. . . . Substantial evidence supports the finding that [Petitioner] committed rape, sodomy and human trafficking by duress or fear.*

*[Petitioner] relies on In re John Z (2003) 29 Cal. 4th 756 to contend these convictions are not supported by substantial evidence because Doe never effectively communicated to him that she had withdrawn her consent.  John Z. is of no assistance to [Petitioner].  There, our Supreme Court held a withdrawal of consent to a sex act can occur and be communicated at any time, even during the act itself. (Id. at pp. 762–763.)  But that factual circumstance is not present here.  Here, the question is whether [Petitioner] used intimidation, threats or coercion to overcome Doe's ability to communicate her lack of consent.  (See, e.g., People v. Maury (2003) 30 Cal.4th 342, 403; People v. Ireland (2010) 188 Cal.App.4th 328, 338.) The jury resolved that question against [Petitioner].  As we have explained, its*

22

1     *determination is supported by substantial evidence.*

2     (LD 6 at 15-18.)

3             **2.  Clearly Established Federal Law.**

4          "To prevail on an insufficiency of evidence claim, a habeas petitioner must

5     show that 'upon the record evidence adduced at the trial[,] no rational trier of fact

6     could have found proof of guilt beyond a reasonable doubt.'" Briceno v. Scribner,

7     555 F.3d 1069, 1078 (9th Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307,

8     324 (1979)).  Under AEDPA, federal courts "owe a 'double dose of deference' to

9     state courts." Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (citation

10    omitted).  To grant habeas relief, the reviewing court must conclude that "the state

11    court's determination that a rational jury could have found that there was sufficient

12    evidence of guilt, i.e., that each required element was proven beyond a reasonable

13    doubt, was objectively unreasonable." Boyer v. Belleque, 659 F.3d 957, 965 (9th

14    Cir. 2011).  Sufficiency of the evidence claims are judged by the elements defined

15    by state law.  See Juan H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005).

16            **3.  Analysis.**

17         Petitioner's argument has some superficial appeal that quickly fades.  Doe

18    initiated contact with him, initially told him that she was 18 years old, expressed

19    excitement about sex with him, and said and did things during their days together

20    that the jury apparently interpreted as consent, at least with respect to some of the

21    charges.  But—and it is a large "but"—Doe was also a 17-year-old girl and

22    Petitioner was decades older.  She testified that he said things that scared her and

23    made her feel like she would be hurt unless she did what he told her to do.  The jury

24    reasonably relied on this evidence in finding Petitioner guilty on Counts 7, 11, and

25    16.

26         Each of Counts 7, 11, and 16 required the prosecution to prove that Petitioner

27    accomplished the sex act or trafficking by means of tactics including duress or

28    menace.  See Cal. Pen. Code §§ 261(a)(2) (rape includes sexual intercourse where

1  "it is accomplished against a person's will by means of force, violence, duress,

2  menace, or fear of immediate and unlawful bodily injury on the person or another"),

3  286(c)(2)(C) (sodomy includes sexual conduct of contact between penis and anus

4  with "another person who is a minor 14 years of age or older when the act is

5  accomplished against the victim's will by means of force, violence, duress, menace,

6  or fear of immediate and unlawful bodily injury on the victim"), 236.1(c)(2)

7  (enhanced punishment where defendant the trafficking of a minor "involves force,

8  fear, fraud, deceit, coercion, violence, duress, menace or threat of unlawful injury to

9  the victim or to another person").

10      Under California law, "duress" involves "psychological coercion." <u>People v.</u>

11  <u>Schulz</u>, 2 Cal. App. 4th 999, 1005 (1992).  It includes an implied threat of danger,

12  hardship, or retribution sufficient to coerce a reasonable person of ordinary

13  susceptibilities to (1) perform an act which otherwise would not have been

14  performed or, (2) acquiesce in an act to which one otherwise would not have

15  submitted.  <u>Id.</u>  Relevant circumstances include the two parties' relative age and

16  sizes.  <u>Id.</u>

17      Petitioner's position is that because Doe expressed excitement about having

18  sex with him before meeting him, never verbally told him, "No," and stayed with

19  him for several days, then there is insufficient evidence of duress or menace to

20  support the verdicts on Counts 7, 11, and 16.  The jury apparently took these facts

21  into account in finding Petitioner ***not*** guilty of forcible rape and sodomy in Counts

22  8, 9, 10, 12, and 13.  The jury did find him guilty forcible rape and sodomy for the

23  first acts of sex and sodomy with Doe (i.e., Counts 7 and 11).  In other words, the

24  jury decided that Doe would not have had vaginal and anal sex with Petitioner

25  initially had it not been for the implied threat of danger, hardship, or retribution.

26      On habeas review, the Court must apply a doubly-deferential standard.  <u>See</u>

27  <u>Coleman</u>, 566 U.S. at 651 ("<u>Jackson</u> claims face a high bar in federal habeas

28  proceedings because they are subject to two layers of judicial deference.").  Under

24

that standard, the California Court of Appeal's determination was not objectively unreasonable.  Doe was 17 years old at the time and Petitioner was in his late thirties.  (11 RT 3039.)[13]  The jury was permitted to take this age difference into account.

According to Doe's testimony, Petitioner made threatening statements to her before they had sexual intercourse and engaged in sodomy.  When he grabbed her head and forced it down to his penis when they first met and she was hesitant, he said that it was "too late for [her] to change [her] mind because he was already there."  (12 RT 3333.)  He was upset and told her that if she was not going to do what he wanted, he "wasn't going to be very happy" and she "wouldn't like the end result of that."  (11 RT 3084; 12 RT 3336.)  At around the same time, he told her that he had been in prison and could "take care of himself."[14]  (11 RT 3084-85; 12 RT 3340.)  An expert on human trafficking testified that, if a pimp told a trafficking victim that he had been incarcerated, the message was that he was capable of being violent.  (16 RT 4560-61.)

According to Doe, Petitioner also said that he could do what he wanted to do "sexually," that she was his "property," and that she had to "listen to what he said" and do it.  (11 RT 3077-78.)  When she told him that she wasn't "ready" when he was about to have sex with her for the first time, he said that she "didn't have the option of not being ready, that it was going to happen whether or not [she] was ready because he was there and he was going to get what he wanted."  (12 RT 3337.)  When she told him she did not like the child pornography he was playing,

---

[13] The Court has been unable to find in the record the point in trial when the jury heard evidence of Petitioner's age.  However, Petitioner has never contested the California Court of Appeal's finding that this evidence was presented.  The Court therefore accepts it as true.

[14] The jury heard corroborating evidence that Petitioner had been incarcerated for his child pornography conviction.  (See 11 RT 3037; 19 RT 5429.)

he became angry, started yelling, and told her that she did not have a choice.  (12 RT 3338.)  She did not feel like she could "say no to the sodomies."  (12 RT 3340.)  When he learned how old she was, he said that "law enforcement had better not get involved," that he could "ruin" her life, and that Doe better not "fuck up" his life, which scared her a "good amount" and felt threatening.[15]  (13 RT 3683-85.)  Doe "kind of" felt forced to do whatever Petitioner said because she would be hurt otherwise.  (11 RT 3127-28.)  She was "afraid" because he seemed "very determined to get what he wanted and that he wouldn't be happy if he didn't get what he wanted."  (11 RT 3066.)

At trial, Petitioner denied making these threatening statements or showing her child pornography (see 17 RT 4841, 4884; 18 RT 5214; 19 RT 5429), but the jury was entitled not to believe him.[16]  Petitioner emphasizes Doe's credibility problems, but he had severe credibility problems of his own.[17]  He admitted that he learned of Doe's age on July 27, the day before Higueros arrived, and there was a

_____

[15] Doe testified that Petitioner made these statements before some of the sex acts and before Higueros arrived (Count 16).  It is unclear from her testimony whether he made these statements about ruining her life before the first rape and sodomy incidents (Counts 7 and 11), but what is clear is that at least some of the other statements were made before those first incidents.

[16] In closing argument, Petitioner suggested that any such statements might have been made as a "dominant" partner—i.e., as part of a sexual dynamic (see 22 RT 6319-20, 633)—but that excuse is farfetched with respect to his threats to Doe about involving law enforcement.  Furthermore, the jury could have reasonably interpreted the statements in a different way.

[17] In his objections to the R&R, Petitioner expresses continued frustration with "this yo-yo game reverting back to something that has already proven to be a lie."  (Dkt. 45 at 3.)  Again, the Court's role on federal habeas review is not to re-weigh the evidence.  This is not a second trial.  The Court is limited to deciding whether the state court unreasonably found that no rational trier of fact could have found Petitioner guilty.  That is an extremely high standard, and Petitioner has not met it.

photograph of her driver's license on his phone.[18]  (17 RT 4863-64; 19 RT 5435, 5496; 15 RT 4267-4268.)  He testified that he thereafter did not have sex with her. (17 RT 4860, 18 RT 5177.)  Yet on July 28, email accounts traceable to Plaintiff submitted posts to craigslist soliciting men for sex with a "young blond."  (14 RT 3927-28, 3946-47; 13 RT 3735-36.)  Plaintiff also wrote to Doe on July 29, "Baby I'm in town till 3:30 . . . I already have three clients from S.F. that want to meet you. One guy offered 500 [just] for me to use you in front of him."  (19 RT 5454.) He texted Doe on July 31—days after when he says he learned her age—"I have weed, money, work, food, drink, drugs, huge black cocks, dirty old men, hot little women, everything you want/need.  Let me help you baby love fuck hole cumslut." (18 RT 5246.)  He wrote to "Sabrina" on August 14, 2014, that she would not be the "first 16-17YO I've fucked or gang banged before."  (15 RT 4303.)  In the September 2014 pretext call, he told Doe that he had a lot of "clients" for "three hundred an hour," and told her that at "large parties" she would get money regardless of whether men "touch[ed]" her or just "watch[ed]." (See Dkt. 33-11 at 92; 18 RT 5240-41.)  When he showed up at the train station Doe had selected, he was arrested.[19]  (11 RT 3146-49; 13 RT 3712.)

The California Court of Appeal reasonably relied on Doe's testimony to conclude that there was sufficient evidence under Jackson to support the "force or fear" elements of Counts 7, 11, and 16.

---

[18] Doe testified that he learned her age on the first day they met.  (See 13 RT 3681.)

[19] Petitioner testified unconvincingly that he did not intend for Doe to prostitute herself but intended rather to use her as an "actress" in front of a "green screen."  (See 19 RT 5459-60.)  He also told the jury that he in fact planned to get Doe "help" for her "condition"—a flimsy claim given that on the same day as the pretext call, he texted "Brian" and wrote, "In case you're interested, I'm banging that 18-year-old blond tonight.  Wanna play?  I already have a room."  (18 RT 5242.)

**C.    Ground 2B: Whether the Trial Court Violated Petitioner's**
**Constitutional Rights by Improperly Excluding Evidence.**

Petitioner argues that his convictions on counts 7, 11, and 16 should be reversed because the trial court improperly excluded evidence relevant to the issue of force or fear.   (See Petition at 7; Dkt. 37 at 2.)

**1.  Procedural Default Argument.**

Respondent contends that Ground 2B is procedurally defaulted to the extent that Petitioner did not comply with the rule governing exceptions to California's rape shield law.[20]   (See Dkt. 41 at 11-13 [citing to state court's finding that defense counsel failed to file appropriate pre-trial motion to qualify for exception to rape shield law].)  This procedural default argument would only apply to evidence of Doe's sexual conduct, not evidence of the dominant/submissive subculture.  (See LD 6 at 13-14 [California Court of Appeal's opinion on the subculture issue, which did not invoke exception to rape shield law]).

The Court does not address Respondent's procedural default argument as to Ground 2B, because the portion of Petitioner's claim regarding evidence of Doe's sexual conduct is clearly not meritorious even on de novo review.  See Chappell, 829 F.3d at 1096.

**2.  Trial Court Proceedings.**

a.    Evidence of Doe's Sexual Conduct with Men Other than Petitioner.

The defense filed a pre-trial motion to introduce evidence of Doe's "previous and post-sexual conduct."  (Dkt. 42-1 at 121-31.)  The prosecutor opposed the motion, arguing that her sexual conduct with others was irrelevant, prejudicial, and

---

[20] California's rape shield law prohibits introducing reputation, opinion, or "specific instances" evidence of complaining witness's sexual conduct to prove consent.  See Cal. Evid. Code § 1103(c)(1).

inadmissible under California Evidence Code Sections 1103 (California's rape shield law) and 1161(b) (a similar statute designed to protect victims of human trafficking).[21]  (Id. at 132-38.)

Petitioner produced to the trial court a packet that contained six exhibits. Exhibit A contained pages from a transcript of interview with Doe by a detective in July 2015.  In it, Doe said that she believed before meeting Petitioner in person that she would only be having sex with him, not with others.  (Dkt. 33-6 at 2-12.) Exhibit B was a three-page handwritten statement written by Doe titled "Voluntary Statement," in which Doe wrote that she had received money for sex from two men in 2014.  (Id. at 14-16).  Exhibit C was a transcript from an interview with Doe by a member of the District Attorney's Child Abuse Interdisciplinary Team.  (See 4 RT 906 [explaining mislabeling of transcript]; Dkt. 33-6 at 20-25.)  Doe states therein that she had engaged in sex with men other than Petitioner by responding to Craig's List advertisements.  (Dkt. 33-6 at 20-25.)  Exhibit D contained text messages between Petitioner and Doe; in one text, she asked him if they could rent a hotel room and "have an orgy or gang bang."  (Id. at 32.)  Exhibit E contained email messages between Petitioner and Doe from before they met in person, including: explicit photos of Doe; her stating that she was "open" to having sex with more than one guy at a time and writing "ok!!!" to Petitioner's statement that he wanted a "small group" of "friends" to "use" her; and Doe's first message to Petitioner stating that she was eighteen years old.  (Id. at 39-92.)  Exhibit F contained more pre-meeting email messages between Petitioner and Doe from a different account

---

[21] "Evidence of sexual history or history of any commercial sexual act of a victim of human trafficking . . . is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."  Cal. Evid. Code § 1161(b).  In cases such as Petitioner's, "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness."  Cal. Evid. Code § 1103(c)(1).

1    used by Doe, in which Doe says "Sweet! How big is his cock?" to Petitioner's

2    statement that he had a "friend" interested in meeting her, and similar statements of

3    receptiveness to having sex with multiple partners at once; she also wrote that she

4    had advertised for more men to join them and was willing to "host." (Id. at 94-

5    149.) Counsel also wanted to present evidence that Doe moved in with Higueros

6    shortly after her weekend with Petitioner. (3 RT 625-631.)

7         The trial court ruled that Petitioner could present texts or emails in which

8    Doe expressed willingness to engage in sexual activity with him, as relevant to the

9    defense of consent and as a state-of-mind exception to hearsay. (4 RT 942-944.)

10   Petitioner's side of the conversation was deemed inadmissible hearsay. (2 RT 943.)

11        The trial court precluded the defense from introducing messages Doe sent to

12   Petitioner expressing willingness to engage in group sex. The court reasoned that

13   none of the forcible rape or sodomy charges involved Doe having sex with anyone

14   other than Petitioner. Thus, evidence of her willingness to have sex with others was

15   irrelevant and would violate Section 1161. The court further explained that the

16   defense was not entitled to impeach Doe on a "collateral issue."[22] (4 RT 945-948.)

17        The trial court precluded the defense from introducing statements Doe made

18   during the criminal investigation about prior acts of prostitution, because her prior

19   or later acts of prostitution were irrelevant to whether she consented to sex with

20   Petitioner or Higueros. (4 RT 951.) The trial court further precluded the defense

21   from presenting evidence that Doe moved into Higueros's home, had sex with him

22   after July 28, and tried to recruit other underage girls to have sex with him. The

23   court found that Petitioner had failed to show relevance to Doe's credibility or

24   whether she was a willing participant in the crimes with which Petitioner was

25   _____

26   [22] The jury did hear evidence of the issue regardless. (See, e.g., 12 RT 3372
     [reading aloud the text message Doe sent to Petitioner asking him to rent a hotel
27   room for an "orgy or gang bang"]; 12 RT 3375 [reading aloud the text message she
     sent to Petitioner saying she wanted "two or three cocks in [her] pussy at once"].)
28

1   charged.  (4 RT 949-50.)  During trial, the court similarly found that a video of Doe

2   having sex with Higueros would not show that she willingly engaged in prostitution

3   on July 28, 2014, rather than as a result of her fear of Petitioner. (13 RT 3607-

4   3608.)

5                    b.  Evidence of Dominant/Submissive Subculture.

6          The trial court admitted into evidence several emails showing that Doe was

7   looking for a sexual relationship where she was "controlled."  (12 RT 3349-3350.)

8   She also testified that she sent emails to Petitioner designed to set the rules and

9   parameters of a submissive-dominant sexual relationship.  (11 RT 3053-3055; 12

10  RT 3350- 3354.)  The trial court permitted Petitioner to testify that the agreed-upon

11  relationship involved Doe being submissive to him.  (16 RT 4648.)  Petitioner

12  explained, "Not so much dominant and submissive, but more masculine and

13  feminine.  Not so much directing or ordering, but, you know, initiating sex acts or

14  saying dirty things.  Not so much physically controlling or mentally controlling,

15  you're just being manly and not metrosexual."  (Id.)

16         The trial court sustained relevance, speculation, and lack of foundation

17  objections when defense counsel tried to ask Doe whether rules were typically "laid

18  out ahead of time" in submissive-dominant relationships.  (12 RT 3354.)  The court

19  also sustained a relevance objection when defense counsel asked her if she was

20  "familiar with what a submissive-dominant relationship was."  (13 RT 3643.)  The

21  court sustained an objection when defense counsel asked Petitioner whether his

22  relationship with Doe reflected a "sexual subculture."  (16 RT 4648-49.)

23         **3.  Relevant Federal Law.**

24         "Whether rooted directly in the Due Process Clause of the Fourteenth

25  Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth

26  Amendment, the Constitution guarantees criminal defendants 'a meaningful

27  opportunity to present a complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690

28  (1986) (citations omitted).  A criminal defendant has the right to cross-examine a

witness against him in order to test the believability of the witness.  <u>Davis v. Alaska</u>, 415 U.S. 308, 315-16 (1974).  The right to cross-examination is not without limits, however.  Trial courts have broad discretion to impose limits on cross-examination, based on evidentiary concerns such as relevancy, harassment, prejudice, delay, duplicity, or confusion of the issues.  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986).

Federal courts conduct a two-part inquiry to determine whether exclusion of evidence violated a criminal defendant's constitutional rights.  <u>Wood v. Alaska</u>, 957 F.2d 1544, 1549-1550 (9th Cir. 1992).  First, the court determines whether the evidence was relevant.  <u>Id.</u> at 1550.  If the evidence is relevant, the court inquires whether the defendant's interest in presenting the evidence outweighed legitimate interests in prohibiting it —i.e., whether the trial court abused its discretion.  <u>Id.</u>

Even when a trial court's exclusion of evidence amounts to a constitutional error, a petitioner is not entitled to federal habeas relief unless he can show that the error was not harmless beyond a reasonable doubt.  Whether such an error is harmless depends on factors including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  <u>Van Arsdall</u>, 475 U.S. at 684.

### 4.  Ground 2B Fails.

a.   Exclusion of Evidence of Doe's Sexual Conduct with Men Other than Petitioner (De Novo Review).[23]

Petitioner argues that evidence of Doe's prior acts of prostitution and her

---

[23] In his Reply, Petitioner contends that a July 28, 2014 check-in receipt from Motel 6 showed that Petitioner left Doe's house "the early morning of July 28, 2014" and therefore could not have committed any sex crimes against Doe that day. (Dkt. 25 at 4-5.)  The Petition's factual support for Ground Two does not mention a Motel 6 receipt.  (Dkt. 1 at 7.)  Neither the Court nor Respondent could find

sexual relationship with Higueros after July 28 would have shown that Petitioner did not use force or fear between July 25 and July 28.[24]

In excluding evidence that Doe prostituted herself to other men before meeting Petitioner, the trial court did not violate Petitioner's constitutional rights, because Petitioner has not shown that this evidence is relevant.  None of the

_____

anywhere in the record where defense counsel tried to introduce a Motel 6 receipt. (See Dkt. 34 at 3.)  Moreover, Petitioner testified at trial that he was at Doe's house on July 28, 2014 in the "afternoon" when Higueros came and left (18 RT 5178, 5182) and that Doe drove him to Motel 6 "a little over an hour" later; they arrived "much later in the evening."  (18 RT 5184, 5186-88).  The Court therefore does not construe Ground Two of the Petition as raising a due process challenge to the exclusion of the Motel 6 receipt.  (In his objections, Petitioner claims that he was "charged for [July]  29th when [he and Doe] were not together," but he does not explain what those charges are.  (See Dkt. 45 at 9.))  Petitioner also argues in the reply that the jury never learned that Doe did not report him to the police; rather, it was a friend who told a counselor who told police.  (See Dkt. 25 at 4-5.)  The Court does not see how this is relevant to whether Petitioner raped, sodomized, and trafficked Doe through force or fear.

[24] Petitioner also argues that the trial court excluded his side of text conversations with Doe, giving the jury "only the victim's text messages taken out of context."  (Petition at 7.)  The Court has reviewed Petitioner's briefs on direct appeal to determine to what he is referring.  It appears that he is referencing a point in the trial when defense counsel invoked the California "rule of completeness" (Cal. Evid. Code § 356) to ask the trial court to admit Petitioner's side of his emails with Doe after the prosecutor introduced Exhibit 28, which showed one portion of an e-mail conversation when Petitioner asked about her curfew.  (See LD 1 at 59 [argument on direct appeal]; see also 12 RT 3303-10.)  Petitioner argued on direct appeal that the trial court misapplied Section 356.  (See LD 1 at 61-62.)  This is a pure issue of state law, and the Court therefore does not address it.  See Estelle v. McGuire, 502 U.S. 62, 67 (1991).  To the extent he argues that any texts or emails were taken out of context, the Court has reviewed both sides of the e-mail and text conversations, and nothing that Doe wrote is misleading viewed in isolation from Petitioner's side of the conversation.  The jury learned from her side of the conversation that she wrote to Petitioner expressing her willingness to have sex with him, participate in an orgy at a hotel, and have sex for money with men he selected.  (See Dkt. 22-12 at 57-59; Dkt. 22-13 at 75.)

33

excluded evidence related to Petitioner's use of force or fear.  That Doe had sex with men other than Petitioner for money before she met him is irrelevant to whether she consented to sex with ***him***.[25]  See Wood, 957 F.2d at 1550 ("The fact that M.G. was willing to pose for Penthouse or act in sexual movies and performances says virtually nothing about whether she would have sex with Wood. It only tends to show that she was willing to have sex, not that she was willing to have sex with this particular man at this particular time.").  Even if it were relevant, the prejudicial effect would have outweighed any slight relevance.  See Chambers v. Mississippi, 410 U.S. 284, 295 (1973) (noting that right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process").  The trial court's evidentiary decisions were therefore supported by well-established state rules of evidence.  See Montana v. Egelhoff, 518 U.S. 37, 42 (1996) ("The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." (citation omitted)); Crane, 476 U.S. at 689-90 ("[T]he Constitution leaves to the judges ... 'wide latitude' to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" (citation omitted)).

Nor has Petitioner shown prejudice from the exclusion.  The jury learned during direct and cross-examination that, before meeting Petitioner, Doe told him multiple times that she wanted to have sex with him and was excited about the idea of an orgy.  (See 12 RT 356 [reading aloud text message to Petitioner that she wanted to "host" and testifying that Petitioner had talked about her "making money by having [her] have sex with other people"]; 12 RT 3372 [reading aloud the text

---

[25] Indeed, Petitioner makes the very argument that the rape shield was designed to foreclose—that if Doe was willing to have sex with other men, then she must have consented to sex with him.

message she sent to Petitioner on July 25, 2014, asking him to rent a hotel room for an "orgy or gang bang"]; 12 RT 3375 [reading aloud the text message she sent to Petitioner saying she wanted "two or three cocks in [her] pussy at once"]).  The jury was thus aware that Doe expressed to Petitioner that she would enjoy sex with men other than him and was interested in accepting money for it.  Learning that she engaged in prostitution before meeting him would not have altered whatever perception the jurors already had of Doe's credibility.

As for evidence that Doe had a sexual relationship with Higueros after July 28 and moved in with him, the only possible relevance would have been to Count 16.[26]  See Cal. Penal Code § 236.1(c) (" A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor . . . to engage in a commercial sex act [while intending to commit pimping or pandering] is guilty of human trafficking," with a heavier sentence if the offense involves "force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim").  The prosecutor argued that Petitioner used force or fear to compel Doe to have sex with Higueros for a commercial purpose.  (See Dkt. 22-22 at 74-75.)  He invoked Doe's testimony, which was:

> Q: Did [Petitioner] ever use words or say things to you that you found threatening?
>
> A: Yes.
>
> Q: And what did you find threatening that he said to you?
>
> A: Well, he never directly said that he would hurt me, but he said, um, things like if, um, I didn't listen to him or things didn't go as planned, that I would not be happy with the end result; and that, um, law

---

[26] That is because for the reasons explained above, Doe's sexual conduct with Higueros would have no bearing on whether beforehand she consented to sexual acts with Petitioner on particular occasions.

1     enforcement better not get involved because, um, he wouldn't be very

2     happy about that and I wouldn't be happy with him being upset.

3     Q: Okay. Were those statements made before Mr. Higueros arrived?

4     A: Yes.

5     . . .

6     Q: Did you feel you could challenge [Petitioner] when he said things

7     to you that you found threatening?

8     A: No.

9     Q: Did you feel you could get away from him?

10     A: No.

11     Q: Did those statements scare you?

12     A: Yes.

13     Q: A lot? A little? Could you quantify?

14     A: Um, a good amount.

15     . . .

16     A: [After Petitioner found out I was 17, he said] I better not fuck up

17     his life, because he would sure as hell ruin mine. And that – he didn't

18     really go much further into it. . . .

19     Q: You found that statement maybe not physically threatening, but

20     intimidating?

21     A: Yes.

22     Q: Was that statement made before Mr. Higueros arrived?

23     A: Yes.

24     (Dkt. 22-14 at 88-90.)

25     Evidence of Doe's sexual conduct with Higueros after she and Petitioner

26  parted ways would have been irrelevant to Count 16.  The issue was whether

27  Petitioner used force or fear to induce her to have sex with Higueros on July 28.

28  The Court might draw a different conclusion on relevance if there was evidence that

Doe and Higueros had a consensual, sexual relationship **before** Doe met Petitioner. As it is, the trial court correctly concluded that even the video of Doe and Higueros having sex on July 28 was irrelevant. The statute focuses on "the Defendant's conduct," making "the manner in which the victim participated in the sex act with Mr. Higueros . . . not relevant." (Dkt. 22-14 at 11-12.) Doe testified in a separate trial that she found Higueros attractive enough to give him her phone number after they had sex.[27] See People v. Higueros, 2018 WL 2112122, at *1 (Cal. Ct. App. May 8, 2018) ("[Doe] gave [her phone number] to [Higueros after sex on July 28] because she found him attractive."). That does not suggest that she would have had sex with Higueros on that day without Petitioner's menacing words and presence in the next room.

           b.      Exclusion of Evidence of Dominant/Submissive Subculture (AEDPA Review).

The appellate court considered the subculture argument, as follows:

*The trial court admitted extensive evidence about the relationship between Doe and [Petitioner]. This included emails, text messages, explicit photographs and videos. In some of the videos, Doe appeared eager to have sex with [Petitioner], and to enjoy being with him. Doe testified that, before they met, she told [Petitioner] she was looking for someone to dominate her and that she wanted to be controlled by him. The two also exchanged emails that were, according to Doe, intended to establish rules and set limits for their relationship. In one exchange, Doe asked [Petitioner] to tell her everything he was interested in doing*

---

[27] Petitioner is operating under the dubious assumption that Doe's sexual activity with Higueros after July 28 was universally consensual. Higueros was sentenced to a lengthy prison sentence because, after Doe moved in with him following a fight with her mother, he broke her wrist during "hate rape"; threatened to kill her if she left, stating that he had murdered his father; and filmed and posted online videos of them having sex where he placed a belt around her neck. See Higueros, 2018 WL 2112122, at *2-11.

*to her, so she could let him know which things she was willing to do. Doe also described a type of sexual activity she did not enjoy. [Petitioner] was also permitted to testify regarding his understanding that Doe had agreed to be submissive to him. What the trial court excluded was more generalized testimony concerning a "subculture" in which individuals agree to dominate or be submissive to one another.*

*We conclude the trial court did not abuse its discretion. First, [Petitioner] did not establish that either Doe or [Petitioner] had personal knowledge of, or claimed membership in a larger "subculture" involving dominant and submissive sex partners. There was no foundation for either witness to opine about that subculture or the extent to which their relationship fit into it. Second, evidence concerning a larger subculture was properly excluded because its negligible probative value would have been substantially outweighed by the danger of undue prejudice and of confusing the issues or misleading the jury. (Evid. Code, § 352.) The jury heard ample evidence about the actual relationship between Doe and [Petitioner], and their respective expectations. Evidence that members of a sexual subculture typically behave in similar (or different) ways would only create the potential for confusion or undue prejudice.*

*Further, any error in excluding the evidence was harmless. The jury had extensive evidence concerning the relationship between Doe and [Petitioner], and the statements they made to each other regarding their desires and boundaries. There is no reasonable probability that [Petitioner] would have obtained a more favorable result had he been permitted to introduce evidence that different people, in different relationships observed different boundaries and followed different rules.*

(LD 6 at 13-14.)

The California Court of Appeal's opinion was not an objectively unreasonable application of clearly established federal law.  As the trial court

1   found, no foundation had been laid for either Doe's or Petitioner's personal

2   knowledge about a particular "subculture."  Furthermore, what mattered at trial was

3   Doe's and Petitioner's interactions, not how participants in a particular subculture

4   typically act.  Admitting evidence of this subculture could have confused the jury.

5   Last, any error was harmless.  The jury heard extensive evidence about how Doe

6   agreed in advance to a "submissive" role in relation to Petitioner.  It saw multiple

7   sexual photos and videos of Doe engaging in seemingly consensual sex acts with

8   Petitioner but nevertheless convicted him of a series of sex-related crimes,

9   including crimes involving force or fear.  Hearing additional evidence about a

10  dominant/submissive "subculture" would been cumulative and would not have

11  changed the verdict.  See Van Arsdall, 475 U.S. at 679 ("[T]rial judges retain wide

12  latitude insofar as the Confrontation Clause is concerned to impose reasonable

13  limits on ... cross-examination based on concerns about, among other things, . . .

14  confusion of the issues . . . or interrogation that is repetitive or only marginally

15  relevant.").

16  **D.**     **Ground Three: Whether Petitioner's Sentence Constitutes Cruel and**

17           **Unusual Punishment under the Eighth Amendment.**

18           **1.**     **Trial Court Proceedings.**

19           At the sentencing hearing, defense counsel argued that a just sentence would

20  be 15 years to life (the mandatory sentence attached to his conviction on Count 16

21  for the forcible human trafficking of a minor) with sentences for the other offenses

22  to run concurrently.  (24 RT 6909.)  Defense counsel cited Petitioner's limited

23  criminal history and argued that the victim's inconsistent testimony about the use of

24  force created a "lingering doubt" that should mitigate Petitioner's sentence.  (24 RT

25  6910-11.)  The prosecution argued that a sentence of 61 years to life was

26  appropriate because Petitioner was "a parasitic individual who preys on young

27  children."  (24 RT 6912.)

28           After counsel addressed the court, Petitioner spoke.  Petitioner asserted his

1  innocence and his belief that the jury would not have convicted him if it had been

2  permitted to see "two boxes full of discovery" that the court had ruled inadmissible.

3  (24 RT 6913-14.)

4          Before pronouncing sentence, the trial court mentioned that the month of

5  January was human trafficking awareness month.  (24 RT 6915.)  The court also

6  noted that after twenty-four years of practicing criminal law, "there are about 15 to

7  20 [cases] that stand out for the depravity of the conduct and utter callousness in the

8  way that the victim is treated; and this is certainly one of those."  (Id.)  The court

9  found that the victim "was extremely naïve and easily manipulated" and that

10  Petitioner had lied throughout most of his testimony, demonstrating that he still

11  posed a danger to society.  (24 RT 6916.)

12          The court announced its sentencing decision on each count, articulating

13  multiple factors in aggravation.  (24 RT 6916-21.)  The court imposed consecutive

14  sentences under California Rules of Court, Rule 4.425 which considered that the

15  crimes were predominantly independent and committed at separate times or places

16  for counts 1, 2, 3, 4, 5, 6, 12, 13, 14, 19, and 20.  (24 RT 6917.)  After the court

17  announced the sentence, defense counsel addressed the court concerning several

18  issues, but he did not object to the sentence on any legal grounds.  (24 RT 6922-

19  25.)

20          **2.  The California Court of Appeal's Decision.**

21          Petitioner argued that his sentence of sixty-one years to life constitutes cruel

22  and unusual punishment under the Eighth Amendment.  (LD 3 at 111.)  He further

23  argued that this claim was not waived by counsel's failure to object at the

24  sentencing hearing, because counsel argued for a concurrent sentence, an argument

25  "otherwise identical" to the constitutional objections raised for the first time on

26  appeal.  (Id. at 124.)

27          The Court of Appeal first rejected this claim on procedural grounds, finding

28  it forfeited because Petitioner's lawyer did not object on constitutional grounds at

the sentencing hearing.  (LD 6 at 21.)

The Court of Appeal went on, however, to consider the merits of Petitioner's Eighth Amendment Claim.  The court noted that the Eighth Amendment is only violated by a sentence "grossly disproportionate" to the severity of the crime.  (Id. at 22.)  The court found that Petitioner's sentence "is similar to sentences that have been upheld in other cases involving multiple sex crimes," citing three California cases as examples.  (Id.)  The court concluded that defense counsel did not provide ineffective assistance by failing to object to the sentence, because it would have been a "meritless objection."  (Id.)

### 3. Ground Three is Procedurally Defaulted, and Petitioner Has Not Shown Cause and Prejudice to Excuse the Default.

Respondent argues that Ground Three is procedurally defaulted under the contemporaneous objection rule.  (Dkt. 21 at 21-22.)  As noted above, this rule is an adequate and independent state procedural rule.  See Zapien, 849 F.3d at 793 n.2; Fairbank, 650 F.3d at 1256.  California regularly applies its contemporaneous objection rule to sentencing proceedings, as the California Court of Appeal did in this case.  See, e.g., People v. Norman, 109 Cal. App. 4th 221, 229 (2003).  Thus, Ground Three is procedurally defaulted.

Petitioner argues that the "cause" of the procedural default was ineffective assistance of counsel ("IAC") in the form of his lawyer's failure to object to his sentence as cruel and unusual punishment.[28]  (Dkt. 1 at 8.)  "[C]ounsel's ineffectiveness in failing to properly preserve [a] claim for review in state court will suffice" for cause to excuse a procedural default, as long as the failure to object was

---

[28] As required to argue cause, Petitioner claimed on direct appeal that his counsel was ineffective for failing to object.  (See LD 3 at 125); see also Edwards v. Carpenter, 529 U.S. 446, 453 (2000) ("An ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.").

"so ineffective as to violate the Federal Constitution" and the IAC claim was "presented to the state courts as an independent claim…." Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Murray v. Carrier, 477 U.S. 478, 489 (1986)).

Generally, a petitioner claiming IAC must show that counsel's performance was deficient, and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial. Id. at 688-89. To show "prejudice," the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In the sentencing context, showing prejudice requires showing a reasonable probability that, but for counsel's deficient performance, the petitioner would have received a lighter sentence. See Glover v. United States, 531 U.S. 198 (2001); Lafler v. Cooper, 566 U.S. 156, 165 (2012)

The Ninth Circuit has held that "IAC claims in the cause-and-prejudice context" should be reviewed "de novo, thereby applying a 'differing standard for evaluating constitutional error as a substantive basis of relief and as a cause to avoid default of other claims.'" Visciotti v. Martel, 862 F.3d 749, 769 (9th Cir. 2016) (quoting Fischetti v. Johnson, 384 F.3d 140, 154 (3d Cir. 2004).[29] Thus, in deciding whether counsel's failure to raise these constitutional arguments is "cause" to excuse the procedural default of this claim, this Court applies "a straightforward analysis whether denial of counsel was 'an independent constitutional violation'" under Strickland v. Washington, 466 U.S. 668, 687 (1984). Visciotti, 862 F.3d at 769 (quoting Fischetti, 384 F.3d at 154-55).

---

[29] Visciotti noted "disagreement among federal courts of appeal on this question." 862 F.3d at 769 n.13 (collecting cases).

Petitioner cannot meet either prong of the <u>Strickland</u> standard.  For the reasons explained by the California Court of Appeal, an objection to his sentence based on the Eighth Amendment would have lacked merit, and failure to raise a meritless objection does not constitute IAC.  <u>See</u> <u>Sanders v. Cullen</u>, 873 F.3d 778, 815 (9th Cir. 2017) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.").  Even if counsel had objected, Petitioner has not demonstrated any probability that such an objection would have led to a lighter sentence.

Having failed to show cause and prejudice, Petitioner is not excused from the procedural default of Ground Three.  <u>See</u> <u>Martinez-Villareal</u>, 80 F.3d at 1305 (9th Cir. 1996).

## VII.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Final Report and Recommendation; and (2) denying the Petition with prejudice.


DATED:  February 16, 2021

_____
KAREN E. SCOTT
United States Magistrate Judge

43